# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 26, 2013 Session

## MICHAEL JERMAINE HARRIS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County**
**No. 281168      Don W. Poole, Judge**

---

### No. E2012-02226-CCA-R3-PC - Filed July 22, 2013

---

Petitioner, Michael Jermaine Harris, was convicted of aggravated arson in 2009 and was sentenced to nineteen years. He unsuccessfully appealed his conviction and sentence. *See State v. Michael Jermaine Harris*, No. E2009-01383-CCA-R3-CD, 2010 WL 3155196, at *1 (Tenn. Crim. App. Aug. 10, 2010). Petitioner filed the instant petition for post-conviction relief in which he alleged that he received ineffective assistance of counsel at trial. Following an evidentiary hearing, the post-conviction court denied relief. On appeal, petitioner argues that he received ineffective assistance of counsel when counsel failed to prepare adequately for trial, failed to obtain an expert witness, failed to procure an alibi witness, and failed to adequately cross-examine one of the police officers involved. Following our review of the parties' arguments, the record, and the applicable law, we affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROGER A. PAGE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Kevin L. Loper (on appeal) and Andrew D. Watts (at post-conviction hearing), Chattanooga, Tennessee, for the appellant, Michael Jermaine Harris.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; William H. Cox, III, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Facts

### A. Trial

This court summarized the facts presented at petitioner's trial in our opinion addressing petitioner's direct appeal:

> On December 24, 2005, a home . . . in Chattanooga was set on fire while people remained inside the structure. On April 26, 2006, a Hamilton County grand jury indicted [petitioner] for the aggravated arson of the residence. After a trial on February 24, 2009, the jury convicted [petitioner] as charged. The trial court held a sentencing hearing and sentenced [petitioner] to 19 years' incarceration at 100 percent service. [Petitioner] filed a timely motion for new trial and notice of appeal.
>
> At trial, Danny Westfield testified that in December 2005, he lived at [the home] in Chattanooga. He explained that the home was a duplex and that he lived on one side, Apartment A, with his girlfriend, Tina Watkins; her brother, Fred Bowen; and his grandson, Demetrius Buchanan. He said that Gail Lee lived in the other side of the duplex, Apartment B. Mr. Westfield stated that he had lived in the duplex for 11 years.
>
> Mr. Westfield testified that on December 24, 2005, he was visiting Ms. Lee's side of the duplex and that "a house full" of people were present to celebrate Christmas. He said that his son, Danny, arrived at the duplex near dusk and that [petitioner] arrived shortly thereafter. Mr. Westfield testified that he knew [petitioner] "from the neighborhood." He said that Danny and [petitioner] began fighting shortly after arriving at Ms. Lee's apartment.
>
> Mr. Westfield testified that "the fight started on the inside[,] and [they] took it on the outside." He said that he did not know why the men were fighting. He estimated that the fighting lasted for approximately five minutes. He testified that he owned a pit bulldog that bit [petitioner] during the scuffle. Mr. Westfield testified that he attempted to stop the fight and that he "ended up shooting [petitioner]." He thought he shot [petitioner] in either the hip or leg with his .32 revolver. He testified that the fighting then stopped and that [petitioner] left.

Mr. Westfield and his son also fled from the residence after the fight. He said that he did not contact the police about the incident. Mr. Westfield pleaded guilty to one count of reckless endangerment for his shooting [petitioner].

Mr. Westfield testified that he returned to his home on December 27, 2005, and observed that his side of the duplex had been burned. He testified that he never gave [petitioner] permission to burn the home.

Ms. Lee testified that she lived in Apartment B at the duplex . . . . She testified that in December 2005, she had lived there for approximately three years. She said that on Christmas Eve[,] she was in her kitchen making chicken and dressing and that her grandson and daughter were in her living room. She said that Mr. Westfield and Mr. Bowen were also present. Ms. Lee testified that she heard "a lot of motion up front," that she witnessed [petitioner] and Danny fighting, and that the two turned over her coffee table. She said that the two also knocked over her unlit kerosene heater and spilled kerosene on the floor. She testified that she knew [petitioner] and that she did not invite him to her home that evening.

Ms. Lee testified that the fight moved outside and that Danny ran into his father's apartment on the other side of the duplex. Ms. Lee then observed [petitioner] use his foot to try to break the windshield of Mr. Westfield's vehicle. She said that [petitioner] then tried to enter Apartment A but that Mr. Westfield pushed him back. She then saw a dog run outside and chase [petitioner]. Ms. Lee stated that she then ran into the house to call 9-1-1 and that she heard three gunshots. Ms. Lee said when she ran back outside a group of unidentified males had taken [petitioner] and "then went on up the street." She said that Mr. Westfie[l]d and Danny remained in the front yard. Ms. Lee said that the police arrived and that she spoke with them.

She testified that, after the police departed, [petitioner] and a group of males returned. She said that [petitioner] told her to "set [her] stuff out" because he was going to burn down the house. Ms. Lee told [petitioner] to go to the hospital because of his gunshot wound, but [petitioner] was "just cussing" about how Mr. Westfield had shot him.

Ms. Lee said that [petitioner] then returned with a larger group of men and that he knocked on Apartment A's door, but nobody answered. Ms. Lee was inside her apartment when she heard the group of men talk about "shooting up" the house, and she again went outside. While outside, she saw

Ms. Watkins open her door. [Petitioner] exclaimed that Mr. Westfield had shot him three times and then showed her the wound on his leg. After [petitioner] left, Ms. Lee discussed with Ms. Watkins whether [petitioner] would actually burn the house. They decided he would not do such a thing and entered their respective apartments.

Ms. Lee said [petitioner] again came to the home. She said, "So him [sic] and some boys were going up the street[,] and he stopped a car[,] and he asked him to take him to the Conoco to get some kerosene, not kerosene, gasoline, because he fixing [sic] to burn the house down." She testified that [petitioner] returned 10 to 15 minutes later with a clear "milk jug or something" with something "pinkish" inside it. She testified that she ran to Apartment A to tell Ms. Watkins to call the police.

Ms. Lee testified that she told [petitioner], "I know you ain't fixing to do what I think you're fixing to do." She said that [petitioner] replied, "Well, I told you to set your stuff out." She then heard [petitioner] shout, "My sister dead, my sister dead, I don't care nothing about nothing no more." She said that [petitioner] picked up the jug and "dashed it on the side real quick" of Apartment A. She again said, "I know you ain't fixing to set this house on fire," and [petitioner] responded, "Yes, I am too." She testified that he then threw a cigarette lighter to ignite a fire at Apartment A and that "the whole door looked like it just blowed off." Ms. Lee stated that Ms. Watkins and Mr. Bowen were both in the home when [petitioner] ignited the fire. She said that [petitioner] then ran into an alley.

She testified that, when she saw police officers, she ran to them and told them to call the fire department. She saw Ms. Watkins exit her home "hollering and screaming and stuff." Ms. Lee testified that she also gave a statement to fire department personnel that evening. Ms. Lee said that as a result of the fire, she had to stay with relatives for three weeks; however, she said that nothing in her home was damaged and that she eventually returned to living there.

On cross-examination, Ms. Lee stated that [petitioner] had worn an orange jumpsuit on the night of the burning and that he had worn it all day. She also said that she spoke to the police prior to the arson and estimated that the burning occurred at 11:00 or 11:30 p.m.

Ms. Watkins testified that she lived in Apartment A with her brother, Mr. Bowen; her boyfriend, Mr. Westfield; and Mr. Westfield's grandson, Mr.

-4-

Buchanon. She explained that her brother, Mr. Bowen, had only one leg and walked by use of a wooden leg.

Ms. Watkins testified that she was sleeping on December 24, 2005, and was unaware of any altercation next door in Apartment B. She stated that she was asleep in the living room when she awoke to her neighbor's telling her to call the police because somebody threatened to burn down her house. She testified that she was on the telephone with the police when the fire started. She said that the front door "blew up" and that she then ran to the back of the apartment, collected her dog, and called for her brother, who was in the back room. She said that she and her brother left through the back door.

Ms. Watkins said that the fire department quickly extinguished the fire but that everything in the home was ruined. She testified that she knew [petitioner] and that she never gave him permission to burn the house.

Christian Lorenzen of the Chattanooga Police Department testified that he was patrolling the area when he observed a home on fire at approximately 10:00 or 10:30 p.m. He drove toward the fire and observed an individual throwing some sort of liquid on the fire that increased its intensity. He watched the fire "rolling up the house." Officer Lorenzen exited his vehicle and chased the individual; however, the man ran out of sight. He identified the individual as [petitioner]. Officer Lorenzen testified that he then attended to the burning home and that after ascertaining that Ms. Watkins and Mr. Bowen were outside the duplex, he focused on controlling the crowd that had formed around the duplex.

Officer Lorenzen testified that he received a call from Park Ridge Hospital that a man had arrived who had a gunshot wound and smelled of kerosene. Based upon what he had learned during his interviews at the scene, he went to the hospital. He identified the man at the hospital as [petitioner], the same man he had chased earlier that evening. He estimated that he visited the hospital at approximately 12:00 a.m.

On cross-examination, Officer Lorenzen described the man that he observed at the fire as a black male with short dreadlocks, dark colored jeans, and a sweatshirt. He could not recall the color of the sweatshirt. He said that he identified the suspect at the hospital by the color of his jeans, his hair, and the smell of a flammable liquid that he believed was kerosene. He testified that the hospital treated a gunshot wound in the victim's thigh. He said that [petitioner] had a weapon on him at the hospital.

Officer Lorenzen maintained that he did not question [petitioner] at the hospital; however, he testified that he asked [petitioner], "Why'd you run from me?" and that [petitioner] responded, "Oh man."

Lieutenant Henry McElvain of the Chattanooga Fire Department testified that he investigated the December 24, 2005 fire. He testified that the incident was reported to the fire department at 10:38 p.m. He arrived at the scene and noted that Apartment A of the duplex had been damaged. He first interviewed Ms. Lee, who told him that [petitioner] had been in a fight at the residence earlier and that he had set the fire.

Lieutenant McElvain testified that most of the fire damage was in the front doorway of Apartment A. He described a "V pattern" going up and out the building. He said that the fire burned the front door and spread to the interior of the home, blackening the ceiling. He determined that the origin of the fire was the front porch area.

Lieutenant McElvain collected debris samples for later examination by the Tennessee Bureau of Investigation ("TBI"). He testified that another member of the fire department went to the hospital and collected clothing from [petitioner] for later examination by the TBI.

Randall Kirk Nelson of the TBI crime laboratory in Nashville testified that he performed an analysis of the debris and clothing collected by the Chattanooga Fire Department. The trial court accepted Agent Nelson as an expert in micro analysis. Agent Nelson's testing of the debris from Apartment A indicated the presence of an evaporated gasoline product. He also examined [petitioner]'s shoes and clothing, which indicated the presence of an evaporated heavy petroleum distillate. He said such distillates include kerosene, diesel fuel, and some charcoal starters.

Agent Nelson admitted that the incendiary agent found from the debris was wholly different than that found on [petitioner]'s clothing. He further testified that nothing indicated that a mixture of a gasoline product and a heavy petroleum distillate was used.

The State rested, and the defense presented Lela McFarrin, the director of medical records at Park Ridge Medical Center. She explained that she gathered records and processed them for the hospital. She received a request to locate the medical records of [petitioner], Michael Harris, for a December 24 or 25, 2005 visit. She testified that she initially could not find [petitioner]'s

hospital records but that, upon learning additional information about his visit, she identified records for "Michael Blunt." She also noted that the date of birth and social security number written for "Michael Blunt" matched that of [petitioner]. She also explained that the registration form originally stated "Michael Harris" but "Harris" had been crossed through and "Blunt" written instead.

On cross-examination, Ms. McFarrin stated that she did not know who filled out the registration form, so she was unaware of who crossed through [petitioner]'s last name. She also acknowledged several inconsistencies in the hospital records. She noted that the time of 10:30 p.m. was hand-written as the arrival time; however, other records indicated an arrival time of 11:20 p.m., a "triage time" of 11:20 p.m., and an "admission time" of 11:41 p.m. Ms. McFarrin admitted that the reported admission times were inconsistent and that human error could occur in the record-making process.

Paula Burgess, a registered nurse, testified that she was working at Park Ridge Medical Center's emergency room on December 24, 2005. She testified that she treated [petitioner]'s gunshot wound on that evening, but she said that she mainly recalled the treatment through her records. She recalled that [petitioner] arrived via private vehicle, and she testified that generally when a patient arrived with a gunshot wound, he was immediately treated. She testified that the person who arrived at the hospital with [petitioner] likely filled out the registration form reflecting "Michael Blunt."

Ms. Burgess addressed the medical forms noting the treatment received by [petitioner]. She testified that she had crossed out the time of 11:20 p.m. and replaced it with 10:30 p.m. written in her handwriting. She testified that when several nurses treat one patient, it is common for inconsistent and inaccurate times to be reported. She acknowledged that the "Time to TX Room" entry originally said 10:30 p.m. in her handwriting but that someone had crossed it out and written 11:30 p.m. Ms. Burgess testified that her records reflected that she started intravenous therapy on [petitioner] at 10:38 p.m. and that laboratory assistants arrived to draw blood at 10:40 p.m. She testified that she had written that the police were notified of the gunshot injury at 10:50 p.m.

Ms. Burgess explained that she had "a habit of writing on napkins and transferring that" to the hospital records. She said that she developed this habit because, in an emergency treatment situation, she did not have time to make official documentation while tending to the patient. She testified that, after she

entered her "scrap" notes into the official records, she disposed of the loose notes.

On cross-examination, Ms. Burgess again acknowledged that the triage time and arrival time stated 11:20 p.m. and that, because of the type of wound, these times would be identical because treatment would start immediately upon arrival. She explained that the computer program used for entering medical records automatically entered the time. She said that, because she generally makes her records after the treatment, the automatically-displayed time is generally much later than the actual procedures and that she has to change it. Ms. Burgess also testified that she heard [petitioner] say "they poured gasoline all over me."

Chris Gaynor testified that he maintained recordings and records for the 9-1-1 center and the computer aided dispatch system ("CAD"). He explained that the CAD entries recorded the calls to and from the police involving reported incidents. He testified that on December 24, 2005, the police were contacted regarding Mr. Westfield's shooting [petitioner] at 9:28 p.m. and that they were contacted regarding the arson at 10:37 p.m. The CAD entries reported that someone with an orange shirt threw something in the house and set it on fire. He said the records reflected a police officer was on foot at the scene at 10:40 p.m. The CAD entries noted that [petitioner] was at Parkridge Hospital at 11:21 p.m., that he was identified at 11:22 p.m., and that an officer observed [petitioner] at the hospital at 11:58 p.m. On cross-examination, Mr. Gaynor stated that the call from the hospital about the reported gunshot occurred at 10:55 p.m.

*Michael Jermaine Harris*, 2010 WL 3155196, at *1-6.

Petitioner filed his petition for post-conviction relief on August 9, 2011. The post-conviction court appointed counsel for the petitioner, and an evidentiary hearing was held on August 6, 2012.

Petitioner testified that he had been convicted of aggravated arson in 2009. He had been released on bond for the majority of the time leading up to his trial. Petitioner testified that he met with trial counsel three times prior to trial. One meeting was by telephone. Another meeting was to sign papers. The third meeting was the day before trial, and trial counsel asked him whether he would testify and what witnesses he had. Petitioner testified that he told trial counsel about three potential witnesses approximately two months prior to trial. Those witnesses were Courtney Hinton, Amanda Burney, and Allen Burney. Petitioner said that he had Mr. Hinton's telephone number but did not have contact information for the

other two potential witnesses. He testified that he told trial counsel that these witnesses would be very helpful to his case, but she made no effort to locate them. Petitioner testified that he never received a plea offer in his case. He said that he recalled discussing accelerants with trial counsel and asked her to procure an expert on accelerants. To his knowledge, trial counsel never contacted an expert. Petitioner testified that trial counsel did not cross-examine the State's witnesses beyond asking "a couple of questions." In particular, he said that trial counsel should have asked witnesses about his clothing because the witnesses' testimony about what the arsonist was wearing did not match what petitioner was wearing at the hospital. He also said that trial counsel should have asked Gail Lee about her alcohol usage, but he admitted on cross-examination that he did not tell trial counsel about that until after the trial was over.

Allen Burney testified that neither trial counsel nor anyone from her staff tried to contact him regarding petitioner's trial. He recalled that petitioner told him someone should be calling him about being a witness, but no one did. He said that he lived in Chattanooga the entire time between petitioner's arrest and his trial.

On cross-examination, Mr. Burney testified that he drove petitioner to the hospital on December 24, 2005. Mr. Burney said that he could not recall the exact time he took petitioner to the hospital, but it was dark and might have been around 8:00 p.m. Mr. Burney testified that petitioner was in pain. He did not notice anything unusual about petitioner's clothing or that petitioner smelled like gasoline or kerosene.

Trial counsel testified that she had been licensed to practice law in Tennessee since 1983 and that she was the district public defender for Hamilton County. She was appointed to represent petitioner in criminal court, but she did not represent him in general sessions court. Trial counsel testified that she met with petitioner more than two times at her office, but she did not have documentation of the exact number of meetings. Trial counsel testified that she came to represent petitioner because of staff shortages in her office. She agreed that she might have been able to meet with petitioner more frequently absent those shortages, but she did not believe that the staffing problems impacted her representation of petitioner.

Trial counsel testified that she spoke with the Tennessee Bureau of Investigation agent who wrote the report on the accelerant used in the arson and the accelerant found on petitioner's clothing. She recalled that the agent found that the accelerant used in the arson was not the same accelerant found on petitioner's clothing. Trial counsel said that she would have needed to present to the court a particularized need for funds to hire a defense expert on accelerants,[1] and at the time, she did not believe she would be able to show that

---

[1] *See* Tenn. Sup. Ct. R. 13, § 5(c).

particularized need because the State's expert "was saying what I wanted [him] to say." Trial counsel testified that having a defense expert to testify about the accelerants might have been more beneficial for petitioner because the jury might have taken an expert's opinion differently than her argument alone, but she also said that the State's expert testified clearly that the accelerant used in the arson was not the same accelerant found on petitioner's clothing.

Trial counsel testified that she was able to present an alibi defense based upon petitioner's hospital records from the night of the arson. She knew that Amanda Burney was a potential alibi witness, and she recalled meeting with Ms. Burney. Trial counsel testified that while Ms. Burney had been at the hospital with petitioner, she did not know anything about the events leading up to his hospitalization other than what he had told her. Trial counsel was not aware of other potential alibi witnesses until after the trial, when petitioner told a member of trial counsel's staff about witnesses who could testify about events from the day of the arson, one of whom was Courtney Hinton. Trial counsel recalled that either she or a member of her staff communicated with Mr. Hinton, and he led them to Allen Burney. Trial counsel's investigator tried to contact Mr. Burney. She explained that she argued in petitioner's motion for new trial that petitioner's witnesses had not come forward before trial and that the trial court should consider their testimony as newly discovered evidence. She was able to obtain an affidavit from Mr. Hinton, but her staff was unable to contact Mr. Burney.

Trial counsel testified that the State made a plea offer to petitioner for him to plead to a Class B felony and serve eight years. She originally communicated the offer to petitioner by letter, but the letter was returned to her undelivered. She relayed the offer to petitioner and his mother in person prior to the trial. Trial counsel recalled that when she talked to petitioner and his mother about the State's plea offer, petitioner's mother asked whether he had any witnesses. Petitioner responded that he did not have any witnesses.

Trial counsel agreed that one of the State's primary means of proving petitioner's identity as the arsonist was through the testimony of Officer Christian Lorenzen. Regarding her cross-examination of Officer Lorenzen, trial counsel testified that she wanted Officer Lorenzen to be very specific about what he saw the suspect doing, such as running and jumping, so that she could rebut his testimony with records from the hospital about petitioner's injuries and the time of his treatment. Her theory was that petitioner was at the hospital being treated while Officer Lorenzen was chasing a suspect.

Following the hearing, the post-conviction court dismissed the petition by written order. With regard to trial counsel's preparation for trial, the post-conviction court found that she prepared for trial by formulating an alibi defense based upon medical records and that petitioner did not give her the names of any potential alibi witnesses other than Amanda

Burney until after the trial. As for those alibi witnesses, trial counsel spoke with Ms. Burney prior to trial. According to trial counsel, Ms. Burney was with petitioner at the hospital but not earlier in the evening. Because Ms. Burney did not testify at the post-conviction hearing, the post-conviction court found that there was no evidence that she could have placed petitioner at the hospital prior to the arson. The post-conviction court found Allen Burney's post-conviction testimony to be inconsistent with petitioner's medical records and post-trial affidavit. The post-conviction court also found that Courtney Hinton's post-trial affidavit was indefinite with respect to time and was outweighed by the more definite trial testimony. The post-conviction court concluded that trial counsel was not ineffective with regard to the alibi witnesses.

The post-conviction court found that trial counsel's performance was not deficient for failure to request an expert to testify regarding accelerants. The post-conviction court found that the State's expert provided clear testimony. Regarding trial counsel's cross-examination of Officer Lorenzen, the post-conviction court found that her performance was neither deficient nor prejudicial because she chose to focus on medical records that indicated Officer Lorenzen was mistaken as to the time he saw the suspect.

## II. Analysis

Petitioner argues that his trial counsel provided ineffective assistance by (1) failing to adequately prepare for trial; (2) failing to obtain an expert in accelerants; (3) failing to present alibi witnesses at trial; and (4) failing to adequately cross-examine prosecution witnesses, especially Officer Lorenzen. The State responds that the post-conviction court properly dismissed the petition for post-conviction relief.

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2012). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2012). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the trial judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The post-conviction court's findings of fact are conclusive on

appeal unless the preponderance of the evidence is otherwise. *Berry v. State*, 366 S.W.3d 160, 169 (Tenn. Crim. App. 2011) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App.1997)). However, conclusions of law receive no presumption of correctness on appeal. *Id.* (citing *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001)). As a mixed question of law and fact, this court's review of petitioner's ineffective assistance of counsel claims is de novo with no presumption of correctness. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (citations omitted).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citing *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975)). When a petitioner claims that he received ineffective assistance of counsel, he must demonstrate both that his lawyer's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007) (citation omitted). It follows that if this court holds that either prong is not met, we are not compelled to consider the other prong. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

To prove that counsel's performance was deficient, petitioner must establish that his attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006)). As our supreme court has previously held:

> "[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations."

*Id.* at 315-16 (quoting *Baxter*, 523 S.W.2d at 934-35). On appellate review of trial counsel's performance, this court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689).

To prove that petitioner suffered prejudice as a result of counsel's deficient performance, he "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn*, 202 S.W.3d at 116 (citing

*Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). As such, petitioner must establish that his attorney's deficient performance was of such magnitude that he was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

The post-conviction court found that trial counsel adequately prepared for trial, and the record supports this finding. The record reflects that trial counsel met with petitioner and also met with his mother and his girlfriend. Trial counsel prepared an alibi defense based upon time stamps on petitioner's medical records, and she presented the medical records and the testimonies of hospital employees at trial. Trial counsel interviewed the State's expert on accelerants prior to trial and was able to determine that his testimony was essentially favorable to petitioner. Clearly, trial counsel's preparation for trial was reasonable, especially in light of the fact that petitioner did not give her the names of potential alibi witnesses until they were preparing for sentencing.

Petitioner contends that trial counsel's failure to procure a defense expert on accelerants constituted deficient performance. Trial counsel testified at the post-conviction hearing that she interviewed the State's expert prior to trial and that the expert planned to testify that the accelerant used in the fire was not the same accelerant found on petitioner's clothing. She further testified that at the time, she did not believe she would be able to show that there was a particularized need for funds to hire an expert for the defense, as required by Tennessee Supreme Court Rule 13, when the State's expert would testify favorably for petitioner. Based on the trial testimony and the post-conviction hearing testimony, we conclude that trial counsel's performance in this regard was not deficient.

Petitioner argues that trial counsel's failure to present alibi witnesses at trial constituted deficient performance, but in his brief, he "concedes that information was provided late to trial counsel regarding witnesses." The post-conviction court accredited trial counsel's testimony that petitioner did not provide her with names of potential alibi witnesses prior to trial. However, petitioner contends that trial counsel would have discovered the witnesses through other means if she had prepared adequately. The post-conviction court found that even if trial counsel had managed to procure these potential alibi witnesses prior to trial, despite petitioner's own failure to tell her about the witnesses, their testimony would not have changed the result of the proceedings. In particular, the post-conviction court noted that trial counsel interviewed one of appellant's potential alibi witnesses, Amanda Burney, prior to trial. Trial counsel testified that she interviewed Ms. Burney because she was appellant's girlfriend at the time of the offense and was with him at the hospital, but she determined that Ms. Burney did not have any personal knowledge of the events that led to petitioner's hospitalization. The post-conviction court did not accredit Allen Burney's testimony at the post-conviction hearing because it conflicted with the testimony and

documents presented at trial.  The post-conviction court reviewed Courtney Hinton's affidavit, which had been presented with the motion for new trial as newly discovered evidence, and found that the general statements made would not have impacted the outcome of the trial.  Based on this evidence, we conclude that trial counsel's performance with regard to presenting these potential alibi witnesses was neither deficient nor prejudicial.

Finally, petitioner argues that trial counsel provided ineffective assistance by failing to adequately cross-examine the State's witnesses, particularly Officer Lorenzen.  The post-conviction court found that trial counsel chose to rebut Officer Lorenzen's testimony regarding the timing of events by introducing petitioner's hospital records.  Her testimony reflects that it was a tactical decision on her part to elicit certain testimony from Officer Lorenzen and then show how he was mistaken through means other than cross-examination.  "The fact that a particular strategy or tactical decision failed does not by itself establish deficiency."  *Felts*, 354 S.W.3d at 277.  Petitioner has not shown that trial counsel's performance was deficient in this regard, nor has he presented any evidence to establish that he was prejudiced by trial counsel's performance.  We conclude that the post-conviction court properly dismissed the petition for post-conviction relief as petitioner has not established that he received ineffective assistance of counsel.  Therefore, he is without relief in this matter.

## CONCLUSION

Based on the parties' arguments, the record, and the applicable law, we affirm the judgment of the post-conviction court.

_____
ROGER A. PAGE, JUDGE

-14-